# UNITED STATES DISTRICT COURT

for the

## Western District of New York

Case No. 6:23-CV-06317 D.G.L
(to be filled in by the Clerk's Office)

Nathaniel Myers ICN#23321

*Plaintiff(s)*

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

JURY TRIAL: Yes ✓ No___

Officer William Folckemer, Officer Joe Christopher, Det. Christopher Schafer, Det. Wigdroski, Erie County, NY,

*Defendant(s)*

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*




**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

(Prisoner Complaint)

**NOTICE**

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name: Nathaniel Myers

All other names by which you have been known: N/A

ID Number: ICN# 23321

Current Institution: Erie County Correctional facility

Address: 11581 Walden, Ave

Alden (*City*) N.Y. (*State*) 14004 (*Zip Code*)

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption. For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

Name: Detective Adam Wigdorski

Job or Title *(if known)*: City of Buffalo N.Y. Police Officer

Shield Number: Unknown

Employer: City of Buffalo N.Y. Police department

Address:

*City* *State* *Zip Code*

☑ Individual capacity ☑ Official capacity

Defendant No. 2

Name: City of Buffalo - Erie County, New York

Job or Title *(if known)*: State of New York

Shield Number: N/A

Employer:

Address:

*City* *State* *Zip Code*

☑ Individual capacity ☑ Official capacity

# EXHIBIT A# 1

Defendant No. 5

Name Officer William Folckemer

Job or Title (if Known) City of Buffalo, NY Police Department

Shield Number Unknown

Employer City of Buffalo N.Y. Police Department

Address

[ ] Individual capacity [ ] Official Capacity

Defendant No. 3

Name: Officer Joseph Cristopher

Job or Title *(if known)*: City of Buffalo, NY Police Officer

Shield Number: N/A Unknown

Employer: City of Buffalo N.Y. Police Department

Address:

City | State | Zip Code

☑ Individual capacity ☑ Official capacity

Additional Defendant = See Attachment EXHIBIT A#1

Defendant No. 4

Name: Det Christopher Schafer

Job or Title *(if known)*: City of Buffalo, NY Police Department

Shield Number: Unknown

Employer: City of Buffalo N.Y. Police Department

Address:

City | State | Zip Code

☑ Individual capacity ☑ Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured t the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

4th Amendment against Unlawful Search and Seizure, and 14th Amendment Due Process, 14th equal protections

C. Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

N/A

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

The defendants who were acting as agents under color of state law and performing goverment functions, knowingly and unreasonably violated plaintiffs rights, failed to protect, intervene or train.

## III. Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- [ ] Pretrial detainee
- [ ] Civilly committed detainee
- [ ] Immigration detainee
- [ ] Convicted and sentenced state prisoner
- [ ] Convicted and sentenced federal prisoner
- [x] Other *(explain)* Sentencing has been temporarly Set aside

## IV. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. If the events giving rise to your claim arose outside an institution, describe where and when they arose.

Feb. 14th 2021 in the city of Buffalo, during a routine patrole and at 68 court Street police Station Feb. 14th 2021

B. If the events giving rise to your claim arose in an institution, describe where and when they arose.

N/A

C. What date and approximate time did the events giving rise to your claim(s) occur?

Feb. 14th, 2021

D. What are the facts underlying your claim(s)? (For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)

Defendants/Detectives Stoped, Searched plaintif without consent or a warrant. Arrested/detained plaintif for a seperate incident and failed to read plaintif Miranda warnings before asking pointed questing that lead to evidence and Statements, that were later Suppressed See also Attachment EXHIBIT A#2

V. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

N/A

VI. Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Compensation for loss of wages and property that has not been recovered. Punitive damages for Unconstitutional treatment and Emotional/distress/ Mental ~~[illegible]~~ Anguish, — not to Exceed 2 Million

## VII. Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

**A.** Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☐ Yes

☑ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

______________________________

**B.** Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☐ Yes

☐ No

☑ Do not know

**C.** Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☐ Yes

☐ No

☑ Do not know

If yes, which claim(s)?

N/A

D. Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☐ Yes

☑ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☑ No

E. If you did file a grievance:

1. Where did you file the grievance?

N/A

2. What did you claim in your grievance?

N/A

3. What was the result, if any?

N/A

4. What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. (Describe all efforts to appeal to the highest level of the grievance process.)

F. If you did not file a grievance:

1. If there are any reasons why you did not file a grievance, state them here:

N/A

2. If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

N/A

G. Please set forth any additional information that is relevant to the exhaustion of your administrative remedies. (See Attachment also: Court decision and Order)

Plaintiff recieved a favorable decision in regards to the evidence Suppressed by Hon. Judge Paul B. Wojteszak, that does not implicate plaintiff's pending prosecution or conviction. Would not render Confinement invalid.

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☒ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

N/A

A. Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B. If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1. Parties to the previous lawsuit

   Plaintiff(s) ______

   Defendant(s) ______

2. Court *(if federal court, name the district; if state court, name the county and State)*

   ______

3. Docket or index number

   ______

4. Name of Judge assigned to your case

   ______

5. Approximate date of filing lawsuit

   ______

6. Is the case still pending?

   ☐ Yes

   ☑ No

   If no, give the approximate date of disposition. ______

7. What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

   N/A

## IX. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 8/16/23

Signature of Plaintiff: Nathaniel Myers

Printed Name of Plaintiff: NAthaniel MYERS

Prison Identification #: ICN # 23321

Prison Address: ~~Alden~~ Erie County Correctional Facility

Alden | N.Y. | 14004
City | State | Zip Code

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

City | State | Zip Code

Telephone Number

E-mail Address

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

---

The People of the State of New York,

vs

NATHANIEL MYERS,

Defendant.

INDICTMENT NO. 00286-2021

---

John J. Flynn, III, Esq.
Erie County District Attorney
BY: David M. Zak, Esq.
Assistant District Attorney
Attorney for the People

James Quinn Auricchio, Esq.
Attorney for the Defendant Nathaniel Myers

**DECISION AND ORDER**

**PAUL B. WOJTASZEK, J.S.C.**

Defendant Nathaniel Myers (hereinafter "the defendant") is charged by this indictment with Criminal Possession of a Weapon in the Second Degree, Penal Law § 265.03(3); and two counts of Criminal Possession of a Controlled Substance in the Seventh Degree, Penal Law § 220.03, all related to allegations that occurred on or about February 14, 2021.

The defendant filed an omnibus motion and affidavit of counsel in support of James Quinn Auricchio, Esq., sworn to on October 31, 2021. The People filed the answering affidavit of Matthew S. Szalkowski, Esq., sworn to on December 16, 2021.

The defendant moved to suppress the physical evidence seized pursuant to Section 710.20 of the Criminal Procedure Law as well as statements he made. A hearing was conducted pursuant to *Mapp v Ohio* (367 US 643 [1961]), *Dunaway v New York* (442 US 200 [1979]), and *People v Ingle* (36 NY2d 413 [1975]). A hearing to suppress statements was also conducted pursuant to *People v Huntley* (15 NY2d 72 [1965]). Officers William Folckemer and Joe Christopher as well as Detective Christopher Schafer of the Buffalo Police Department testified. The hearing was conducted over two days on May 3, 2022 and June 27, 2022.

The Motion also challenges the search warrant issued by Hon. Christopher Burns, J.S.C. on February 14, 2021 that allowed for the search of defendant's residence located at 47 Oberlin Avenue, Apartment rear, Buffalo, New York 14211.

**Findings of Fact and Conclusions of Law:**

On February 14, 2021 Officer William Folckemer was working with Officer Joe Christopher on routine patrol in uniform and in a marked patrol vehicle in the City of Buffalo when he observed a red SUV parked with the engine running with two occupants that matched a BOLO ("be on the lookout") (Exhibit 4) that had been issued on February 10, 2021 for a person considered armed and dangerous. Officer Christopher received a call from Detective Paul Fitzpatrick that there was a person in that car wanted by other detectives for questioning. Officer Folckemer approached the parked vehicle on the driver's side and began talking with the driver, the defendant.

He learned the defendant did not have a valid driver's license and he also noticed an open container of alcohol in the car. He issued the defendant three Vehicle & Traffic Law tickets: falsifying a temporary registration; unregistered motor vehicle; and unlicensed operator (Exhibits 6-8).

The occupants were told to exit the vehicle. The defendant was detained in handcuffs, placed in the back of the patrol car, and taken into custody at the request of Detective Fitzpatrick based on possible charges unrelated to the charges arising out of the car stop. Officer Folckemer then searched the car without a warrant looking for potential contraband, specifically weapons based on the BOLO. He did not find anything. The defendant was then taken to headquarters where he was interviewed by detectives for several hours (Exhibits 2 and 3). Before the interview Officer Christopher conducted a pat search of the defendant prior to removing his handcuffs to ensure officer safety during the interview. At that time he noticed a lump in the defendant's right sock that the defendant indicated was crack cocaine. Officer Folckemer recovered the crack cocaine from the defendant's boot and finished searching him.

At police headquarters Detective Christopher Schafer interviewed the defendant first. He read the appropriate *Miranda* warnings (Exhibit 9) and the defendant acknowledged he understood them (Exhibit 2). Thereafter lead Detective Wigdorski also questioned the defendant until the defendant indicated he no longer wished to speak, at which time the detective stopped asking questions and left the interview room. When the interview ended the defendant was taken to Central Booking for processing.

At the conclusion of the hearing the defendant argued, among other things, that there was no lawful basis for the seizure of the defendant. As such, anything subsequently seized from his person and any statements he made despite being read his *Miranda* warnings, should all be suppressed as fruit of the poisonous tree.

For all the foregoing reasons, it is hereby:

ORDERED, that the defendant's motion to suppress evidence and statements resulting from the February 14, 2021 car stop is granted, and it is hereby,

ORDERED, that the defendant's motion to suppress evidence seized pursuant to the lawful execution of the search warrant is denied.

This decision and order constitutes the order of this Court.

DATED: Buffalo, New York
September 19, 2022

PAUL B. WOJTASZEK
Supreme Court Justice

Pg. 1

EXHIBIT A#2

# COMPLAINT

On february 14th, of 2021, plaintiff Nathaniel Myers, while sitting in a parked car was approached by both Officer Joe Christopher and Officer William folckemer. When these two Officers approached the plaintiff, with their weapons drawn, began to ask the plaintiff questions that lead to the officers issuing three vehicle and traffic Law tickets.

After officers wrote out the tickets, the plaintiff and passenger were ordered out of the vehicle. Apon exiting the vehicle, the plaintiff was "patted down", placed into handcuffs and taken into custody for questioning of an unrelated incident. Plaintiff did not consent to be searched, have his vehicle searched, or be detained.

Officer Folckemer, then searched the vehicle without a warrant, and did not find anything. His reason for searching was to find contraband and not to take inventory of property.

Once at the police headquarters/68 Court Street, plaintiff was again patted down and searched aside the patrole car and nothing illegal was discovered. Plaintiff, was again patted down in the police headquarters and then asked by Officer Christopher, what was contained in a lump in the plaintiff's Sock. Plaintiff admitted to the lump, being crack cocain, and the drugs were removed by Officer folckemer.

Plaintiff's, miranda warnings had not been read to him until at police headquarters by Det. Christopher Schafer, as he began to interview the plaintiff.

Plaintiff was questioned until he refused to Speak anymore and then taken to Central Booking for processing.

On May 3, 2021 and June 27, 2022, plaintiff moved to have physical evidence seized, as well as statements he made suppressed as fruits of a poisonous tree. It was ordered by Hon. Paul B. Wojtaszek, that the controlled substance, found in plaintiff's sock and statements resulting from february 14, 2021 be suppressed.

Aside from the plaintiff's unlawful search and seizure that took place on february 14, 2021, there was a warrant obtained to search the plaintiff's residence and evidence from that lawful search was not suppressed.

The evidence that was seized/recovered from the plaintiff's residence (47 Oberlin street, in the city of Buffalo NY) was the product of a warrant obtained from an unrelated to the search and seizure of february 14th of 2021.

Plaintiff, is still unfortunately incarcerated for the evidence found in that unrelated incident that was not implicated or rendered invalid, from the suppression of statements and evidence from february 14th's traffic stop.

During the Search that took place with the traffic stop, plaintiff's money, coat, and hat were taken. Those iteams haven't been recovered or recorded in property reciepts. Plaintiff's vehicle, was also impounded due to his immediate detention that was unlawful and was unable to ever be recovered.

Due to Covid 19, in 2021, if Someone was charged with a non-violent crime in Buffalo NY, they were to be given an appearance ticket. Although, there was a "BOLO" out on the plaintiff, a BOLO does not act as or take the place of an actual warrant, but only provides an officer Suspicion to investigate further.

Plaintiff, believes that his Due process was violated when the officers approached him with there weapons drawn, Searched him the Second time, third time, and when his vehicle was searched without consent. Even though nothing was found in the vehicle, nothing Stopped the officers from obtaining a warrant.

Plaintiff also feels that Erie County New York, Should be held liable for the unconstitutional actions performed by it's law enforcement agencies, with its Knowledge and consent. The State Civil Service laws, unions and arbitrators, that make it difficult to discipline or fire officers for misconduct and incompetence encourges more of that treatment. See alS attachment, a newspaper article tittled "Over 225 cops, jail guards have been disciplined for misconduct Since 2017". This article States "When Supervisors determined

there was misconduct by their officers, the most common punishments were verbal or written reprimands, which were given 52% of the time. Thirty-nine percent of cases resulted in suspension, which ranged from one shift to 60 days.

Less than 10% of the time the officers were fired, resigned or retired while facing disciplinary measures."

Nathaniel J Myers
#23321

UFFALO NEWS WATCHDOG

# Over 225 cops, jail guards have been disciplined for misconduct since 2017



Clockwise from top left: Erie County Sheriff's Deputy Kenneth Achtyl, left, arrests Buffalo Bills fan Nicholas Belsito; Erie County Correctional Officer Anil Kawal slams a hatch door on the hand of an inmate; Cheektowaga Police Officer Sean Trapper engages in an altercation outside the Route 78 Street Bar; Tonawanda Police Officer Adam Cruz points his gun at occupants of a car.

## Police discipline database

*This is a small sample of police discipline cases in Erie and Niagara counties from a database compiled by The Buffalo News. Go to www.buffalonews.com to see the full database with substantiated complaints against 225 police officers.*

| Police Department | Year | Officer Name | Allegations | Result |
|---|---|---|---|---|
| Buffalo | 2020 | Majed S. Ottman | Excessive force/officer-involved shooting | 5 days without pay |
| Cheektowaga | 2020 | Sean Trapper | Compliance with Code of Ethics, department mission | 6-month unpaid suspension |
| Erie County Sheriff | 2020 | Kristen Gellman | Gellman had been using ECSO computer systems to gather information for personal agenda | One-day suspension |
| Erie County Sheriff | 2019 | Wallace Waliczek | Waliczek was arrested on 10/8/19 on charges of promoting prostitution | Terminated |
| Niagara Falls | 2020 | Erik O'Grady | In-custody death investigation | Resigned |
| West Seneca | 2020 | Derek Vasquez | Vasquez pleaded guilty to official misconduct for having sex on duty with a domestic violence victim | Resigned |



*View:* FOR A SEARCHABLE DATABASE OF WHICH BUFFALO-AREA POLICE OFFICERS HAVE BEEN DISCIPLINED, POINT YOUR SMARTPHONE CAMERA AT THE QR CODE AND TAP THE LINK

## *News investigation reveal[s] local agencies' responses t[o] complaints against officer[s]*

By Charlie Specht

News Staff Reporter

More than 225 police officers and guards in Western New York have been [sus]pended, fired or resigned while facing [alle]gations of misconduct in the last five ye[ars].

A Buffalo News investigation of [more] than 1,300 police records that until rec[ently] were concealed from public view rev[ealed] that 15 of Erie and Niagara counties' la[rgest] police departments:

- Employed at least 166 officers who [were] suspended and 59 officers who were fi[red or] resigned after facing allegations of m[iscon]duct since 2017. Some officers had m[ultiple] suspensions and were counted more [than] once.

See Police on Page A13

WNY school boards

...areas of
...ara Falls
...release a
...response
...formation
...ober 2020
...isciplinary
...or denied
...ough they
...be affected

...ness days
...fter follow-
...– produced
...misconduct

...on, Niagara
...ino said the
...was respon-
...Chief John
...artment did
...the records.
...hief Brian J.
...along with
...worn camer-
...era of trans-
...nent in New

...ng thing for
...used to that
...es absolutely
...ice in the pro-

...after original-
...of files to The
...officers – has,
...attorneys, be-
...L requests on
...ecords contain
...hat "do not in-
...members of
...of public con-

...we have to an-
..." Gould said.
...Public Officers
...ice disciplinary
...rcement agen-
...s pertaining to

...echnical infrac-
...ns that "do not
...with members of
...public concern,
...se connected to
...igative, enforce-
...vision, or report-

...base

...e paper and digi-
...than 1,300 inter-
...vided by local po-
...nd entered them
...identify trends in
...nt agencies police
...the departments

...ing New York state ... nna police and Lockport police that came from the state Division of Criminal Justice Services.

The database of allegations includes excessive use of force, false arrests, sleeping or drinking alcohol on duty, sick time abuse, domestic disputes, drunken driving, allowing prisoners to escape, falsifying records, insubordination and workplace harassment.

The News did not include in the database cases where the outcome was not clear, where the allegations were withdrawn or where the cases are still being reviewed by police agencies.

When supervisors determined there was misconduct by their officers, the most common punishments were verbal or written reprimands, which were given 52% of the time. Thirty-nine percent of cases resulted in suspensions, which ranged from one shift to 30 days.

Less than 10% of the time the officers were fired, resigned or retired while facing disciplinary measures.

Roughly 200 cases involved allegations of police officers using excessive force on civilians.

When police internal affairs units investigate the use of force, they either exonerated their fellow officers or said there was not enough evidence to prove wrongdoing 86% of the time. Police agencies found their officers used excessive force 28 times in a five-year period.

## Excessive force in Tonawanda

One excessive force case involved Adam Cruz, a City of Tonawanda police officer.

Cruz, a Tonawanda native who said it was his lifelong ambition to be a police officer, was hired in 2017 and caught a burglar in the act just one week after he completed the police academy.

He received notoriety for that arrest, but a series of incidents involving the escalating use of force later cost him his job.

In 2018, he was reprimanded for acting "hastily" in arresting three men who were suspected of damaging "road closed" signs. Supervisors said Cruz and his partner should only have arrested two of the men.

Two years later, Cruz deployed his Taser while officers were trying to handcuff a man. One of the Taser prongs attached to the man's hand but another prong hit a fellow officer.

"PO Cruz owned up to the mistake and realizes he should not have used ... was pretty sure she ... was knocked out cold before she hit the ground. I then watched her get dragged by her sweatshirt hoodie across the road."

The woman later told police that she "must have blacked out" after Cruz struck her. A female officer asked her if she needed medical attention. She said she had injuries to her head, face, legs, knees, heels, neck and jaw.

"Officer Cruz's use of force on the occupant was unnecessary, as she was of no immediate threat to any of the officers at the scene," a supervisor wrote, adding that he "did not need to rapidly escalate" the situation.

Cruz was suspended for 15 days. He signed an agreement with the Tonawanda mayor stating that although he "committed various acts of misconduct," the city would provide Cruz "one last chance" to keep his job if he stayed out of trouble.

But less than six months later, Tonawanda police notified the state that they were removing Cruz for cause "for incompetence or misconduct pursuant to ... an employee's resignation or retirement while a disciplinary process has commenced."

The city and Cruz are also named as defendants in a lawsuit filed in State Supreme Court after Cruz left the force. Video shows Cruz in 2019 tackled a vendor at Canal Fest. Police at the time said Cruz was breaking up a fight, but the man said the tackle was unprovoked and that he was seriously injured.

Reached by phone, Cruz declined to comment about his discipline record. Tonawanda Police Capt. Fredric Foels said the city's police chief declined to comment on Cruz, other than to say he left the department in October 2020.

## Sheriff's deputy used racial slur

Misconduct allegations may have led Cruz to turn in his badge, but other officers who were found to have committed misconduct kept their jobs.

Niagara County Sheriff's Deputy Joseph Flagler was one of them.

Flagler wasn't disciplined for anything he did in uniform. But the words he used during an off-duty incident with a motorist were so "totally unacceptable" that sheriff's officials were compelled to act, disciplinary records stated.

In July 2017, Flagler was involved in a dispute during which Flagler yelled at a man, using the worst racial slur that can be aimed at Black people.

... said.

The driver of the vehicle was Black and the two passengers were white, but Flagler said he did not realize the driver was Black when he made the comment. He said he is not a racist.

"No, I'm not," he said. "You don't define someone from a 5-minute action."

Gresham, who is a policy fellow at the nonprofit Partnership for the Public Good, said police officers who use racial slurs should not be able to keep their jobs.

When asked about the incident, Niagara County Sheriff Michael J. Filicetti – who was undersheriff at the time – said in a written statement, "This is not the type of conduct that is expected or tolerated from a member of this office. This complaint was handled swiftly and with appropriate discipline."

## Officers rarely fired

Even the excessive force allegations that were substantiated by police departments rarely resulted in the firings or resignations of officers, The News' analysis showed.

Of the 28 sustained excessive force cases reviewed by The News, six officers were fired or resigned.

The other 22 officers were either suspended for one or more days, "counseled" or reprimanded by their superiors.

Beilein, the former Niagara County sheriff, said state civil service laws, powerful police unions and arbitrators who often side with police make it difficult for police chiefs and sheriffs to fire officers who have crossed the line.

"Is this a person who's been there 15 years and it's the first time you've ever disciplined him? You're probably not going to be able to sustain a firing unless it's very egregious," he said.

Gresham said the lack of consequences for police officers in high-profile misconduct cases is one reason public trust in police has fallen in recent years.

"If police officers as a class are being held in a lower regard, it's primarily because most police departments protect their worst officers as vigorously as they do their best ones," Gresham said. "If you got rid of th... officers ... I think public opinion ... wards the police would change ... nificantly."

*News staff reporters Matthew Spina and Aaron Besecker contributed to t... report.*

er Andrew Rechin was filmed, then fired for instigating a bar fight. An investigation shows local departments very rarely go that far in disciplining their personnel.

# e departments were reluctant to provide data

rom A1

fficers to keep serious miscon- using excessive sing racial slurs. d their officers force. Officers used excessive ose cases.

cord of making lic. Some agen- ndreds of files ways to conceal release, despite ate law that had cy.

s represents the ever conducted ases in Erie and e total number uspended, fired e under investi- t is likely even ' tally because t seek records w enforcement

enforcement – that such in- able and war- cautioned that entative of the ficers who have

nalysis showed cers who were duct, were fired ng discipline in nprised 12% of departments as

of officers in y try very hard every day," said former Niagara e's a few that ries of internal affairs cases that shed new light on how police agencies police their own.

The Buffalo Police Department had such an antiquated system of record-keeping that leaders originally said it would take months to provide files on its more than 800 officers. The department has since turned over basic disciplinary records on hundreds of officers who were suspended or fired.

But there is delay and hesitancy in other departments to turn over their disciplinary records.

The New York State Police said The News' record request – which asked for sustained allegations against all troopers in Western New York's Troop A – was too broad and could not be fulfilled because troopers often move between different troops or areas of the state.

For 17 months, the Niagara Falls Police Department failed to release a single disciplinary record in response to The News' Freedom of Information request. City officials in October 2020 said the request for police disciplinary records would be granted or denied within 20 business days, though they said response times would be affected by Covid-19.

More than 350 business days passed before the city – after follow-up inquiries by The News – produced a ledger of more than 200 misconduct cases dating back to 2015.

Through a spokesperson, Niagara Falls Mayor Robert Restaino said the city's Law Department was responsible for the delay. Police Chief John Faso said the Police Department did not oppose the release of the records.

Cheektowaga Police Chief Brian J. Gould said the new law, along with the proliferation of body-worn cameras, has ushered in a new era of trans-



**Sheriff's Deputy Joseph Flagler was disciplined in 2017 for using a racial slur while off duty. He told The News he regrets the incident.**

named above, there are also records from police agencies in Amherst, Lancaster, the City of Tonawanda, West Seneca and the Niagara Frontier Transit Authority Police.

The database also includes records of some case decertifications involving New York State police, Lackawanna police and Lockport police that came from the state Division of Criminal Justice Services.

The database of allegations includes excessive use of force, false arrests, sleeping or drinking alcohol on duty, sick time abuse, domestic disputes, drunken driving, allowing prisoners to escape, falsifying records, insubordination and workplace harassment.

The News did not include in the database cases where the outcome was not clear, were the allegations were withdrawn or where the cases are still being reviewed by police agencies.

When supervisors determined there was misconduct by their officers, the most common punishments were verbal or written reprimands, which were given 52% of the time. Thirty-nine percent of cases resulted in suspensions, which ranged from one shift to 30 days.

Less than 10% of the time the officers were fired, resigned or retired

the Taser with officers in extremely close proximity to the target," his supervisor wrote.

But on June 1, 2020, Cruz stopped a vehicle after receiving a report of a Molotov cocktail being thrown out of a car's window on the Niagara Thruway.

After the driver and one passenger exited the vehicle on Cruz's orders, a second passenger – a girl under the age of 18 – stepped out of the vehicle with her arms above her head.

Police said the girl failed to turn around when ordered to, so Cruz "charged" at the woman and "used his leg to perform a 'front push kick' striking [redacted] in the chest which knocked her against the car, causing her to fall to the ground and sustain injury."

One witness told police that she was pretty sure the girl "was knocked out cold before she hit the ground. I then watched her get dragged by her sweatshirt hoodie across the road."

The woman later told police that she "must have blacked out" after Cruz struck her. A female officer asked her if she needed medical attention. She said she had injuries to her head, face, legs, knees, heels, neck and jaw.

"Officer Cruz's use of force on the occupant was unnecessary, as she was of no immediate threat to any of the officers at the scene," a supervisor wrote, adding that he "did not need to rapidly escalate" the situation.

Cruz was suspended for 15 days. He signed an agreement with the Tonawanda mayor stating that although he "committed various acts of misconduct," the city would provide Cruz "one last chance" to keep his job if he stayed out of trouble.

But less than six months later, Tonawanda police notified the state that they were removing Cruz for

His superiors wrote to Flagler, "This type of language is totally unacceptable in any circumstance and certainly qualifies as a derogatory comment in regards to the citizen's race or national origin."

Flagler was suspended without pay for seven days.

Now retired, he said in an interview with The News that he regrets the incident.

"I don't want something like that to define me, because that's not who I am," Flagler said.

Flagler said he was in a hurry when a car cut in front of him while he was exiting the driveway of a business.

"I had a lot of things on my plate to get done, and I got cut off coming out of that driveway, and I yelled out my window, and they turned around and stopped in front of me and confronted me in the middle of the street," he said.

The driver of the vehicle was Black and the two passengers were white, but Flagler said he did not realize the driver was Black when he made the comment. He said he is not a racist.

"No, I'm not," he said. "You don't define someone from a 5-minute action."

Gresham, who is a policy fellow at the nonprofit Partnership for the Public Good, said police officers who use racial slurs should not be able to keep their jobs.

When asked about the incident, Niagara County Sheriff Michael J. Filicetti – who was undersheriff at the time – said in a written statement, "This is not the type of conduct that is expected or tolerated from a member of this office. This complaint was handled swiftly and with appropriate discipline."

## Officers rarely fired

the last five years comprised 12% of total officers in those departments as of 2019.

"The vast majority of officers in Western New York, they try very hard to do the right thing every day," said Thomas A. Beilein, a former Niagara County sheriff. "There's a few that cause most of the problems, and they usually are frequent flyers when it comes to discipline."

Police reform advocates said The News' findings disappointed them – but did not surprise them.

"I think it's consistent with everything else I've seen about police discipline," said attorney Miles Gresham, a member of the Erie County Police Reform and Reinvention Collaborative Task Force, which was appointed by Erie County Executive Mark Poloncarz to review the Sheriff's Office. "Generally, police are rarely held accountable for their actions, and when they are, the disciplinary action is almost always too light."

## Records were off-limits

The scope of police misconduct in New York has been hidden for years, shielded by an obscure part of state law that made police personnel records off-limits to the public.

That statute, known as Civil Rights Law 50-a, was repealed in 2020 after the death of George Floyd at the hands of a Minneapolis police officer.

After the law's repeal, The Buffalo News filed Freedom of Information Law requests to local government agencies for the disciplinary records of officers and other law enforcement personnel who are paid with tax dollars.

Sheriffs in Erie and Niagara counties and police in the towns of Cheektowaga, Tonawanda and Hamburg have in some ways lived up to the law's new promise of transparency, releasing spreadsheets and summa-

city's Law Department was responsible for the delay. Police Chief John Faso said the Police Department did not oppose the release of the records.

Cheektowaga Police Chief Brian J. Gould said the new law, along with the proliferation of body-worn cameras, has ushered in a new era of transparency for law enforcement in New York.

"It's been a challenging thing for police officers to get used to that change, but I think it does absolutely help with public confidence in the profession," Gould said.

But Cheektowaga – after originally releasing hundreds of files to The News on many of its officers – has, after consulting with attorneys, begun to deny some FOIL requests on the grounds that the records contain "technical violations" that "do not involve interactions with members of the public" or "are not of public concern."

"At the same time, we have to answer to our employees," Gould said.

The New York State Public Officers Law states that for police disciplinary records, "a law enforcement agency may redact records pertaining to technical infractions."

The law defines technical infractions as rule violations that "do not involve interactions with members of the public, are not of public concern, and are not otherwise connected to such person's investigative, enforcement, training, supervision, or reporting responsibilities."

## Building a database

The News took the paper and digital records of more than 1,300 internal affairs cases provided by local police departments and entered them into a database to identify trends in how law enforcement agencies police their own.

In addition to the departments

cers, the most common punishments were verbal or written reprimands, which were given 52% of the time. Thirty-nine percent of cases resulted in suspensions, which ranged from one shift to 60 days.

Less than 10% of the time the officers were fired, resigned or retired while facing disciplinary measures.

Roughly 200 cases involved allegations of police officers using excessive force on civilians.

When police internal affairs units investigate the use of force, they either exonerated their fellow officers or said there was not enough evidence to prove wrongdoing 86% of the time. Police agencies found their officers used excessive force 28 times in a five-year period.

## Excessive force in Tonawanda

One excessive force case involved Adam Cruz, a City of Tonawanda police officer.

Cruz, a Tonawanda native who said it was his lifelong ambition to be a police officer, was hired in 2017 and caught a burglar in the act just one week after he completed the police academy.

He received notoriety for that arrest, but a series of incidents involving the escalating use of force later cost him his job.

In 2018, he was reprimanded for acting "hastily" in arresting three men who were suspected of damaging "road closed" signs. Supervisors said Cruz and his partner should only have arrested two of the men.

Two years later, Cruz deployed his Taser while officers were trying to handcuff a man. One of the Taser prongs attached to the man's hand but another prong hit a fellow officer.

"PO Cruz owned up to the mistake and realizes he should not have used

He signed an agreement with the Tonawanda mayor stating that although he "committed various acts of misconduct," the city would provide Cruz "one last chance" to keep his job if he stayed out of trouble.

But less than six months later, Tonawanda police notified the state that they were removing Cruz for cause "for incompetence or misconduct pursuant to … an employee's resignation or retirement while a disciplinary process has commenced."

The city and Cruz are also named as defendants in a lawsuit filed in State Supreme Court after Cruz left the force. Video shows Cruz in 2019 tackled a vendor at Canal Fest. Police at the time said Cruz was breaking up a fight, but the man said the tackle was unprovoked and that he was seriously injured.

Reached by phone, Cruz declined to comment about his discipline record. Tonawanda Police Capt. Fredric Foels said the city's police chief declined to comment on Cruz, other than to say he left the department in October 2020.

## Sheriff's deputy used racial slur

Misconduct allegations may have led Cruz to turn in his badge, but other officers who were found to have committed misconduct kept their jobs.

Niagara County Sheriff's Deputy Joseph Flagler was one of them.

Flagler wasn't disciplined for anything he did in uniform. But the words he used during an off-duty incident with a motorist were so "totally unacceptable" that sheriff's officials were compelled to act, disciplinary records stated.

In July 2017, Flagler was involved in a dispute during which Flagler yelled at a man, using the worst racial slur that can be aimed at Black people.

licetti – who was under … time – said in a writt… "This is not the type of … is expected or tolerated … ber of this office. This c… handled swiftly and wit… discipline."

## Officers rarely fire…

Even the excessive … tions that were substan… lice departments rarely r… firings or resignations of… News' analysis showed.

Of the 28 sustained e… cases reviewed by The N… cers were fired or resign…

The other 22 officers … suspended for one or … "counseled" or repriman… superiors.

Beilein, the former Ni… ty sheriff, said state civil … powerful police unions … tors who often side with … it difficult for police chie… iffs to fire officers who … the line.

"Is this a person who… 15 years and it's the first … ever disciplined him? You… not going to be able to s… ing unless it's very egregi…

Gresham said the lac… quences for police offic… profile misconduct cases … son public trust in police … recent years.

"If police officers as a … ing held in a lower rega… marily because most po… ments protect their worst … vigorously as they do thei… Gresham said. "If you got … officers … I think public … wards the police would … nificantly."

*News staff reporters Matthe… and Aaron Besecker contrib… report.*

Buffalo Police Officer Andrew Rechin was filmed, then fired for instigating a bar fight. An investigation shows local departments w

# Police departments were reluctant t

POLICE • from A1

•Allowed some officers to keep their badges despite serious misconduct ranging from using excessive force on civilians to using racial slurs.

•Rarely determined their officers had used excessive force. Officers were found to have used excessive force in only 14% of those cases.

•Had a mixed record of making disciplinary files public. Some agencies turned over hundreds of files while others found ways to conceal them or delay their release, despite the 2020 repeal of a state law that had shielded them in secrecy.

The News' analysis represents the broadest public review ever conducted of police misconduct cases in Erie and Niagara counties. The total number of officers who were suspended, fired or who resigned while under investigation for misconduct is likely even higher than The News' tally because The News did not seek records from the smallest law enforcement entities.

Members of law enforcement – while acknowledging that such incidents were inexcusable and warranted discipline – cautioned that they were not representative of the hundreds of police officers who have served with honor.

A Buffalo News analysis showed the roughly 225 officers who were suspended for misconduct, were fired or resigned while facing discipline in the last five years comprised 12% of total officers in those departments as of 2019.

"The vast majority of officers in Western New York, they try very hard to do the right thing every day," said Thomas A. Beilein, a former Niagara County sheriff. "There's a few that cause most of the problems, and they usually are frequent flyers when it comes to discipline."

Police reform advocates said The News' findings disappointed them – but did not surprise them.

"I think it's consistent with everything else I've seen about police discipline," said attorney Miles Gresham, a member of the Erie County Police Reform and Reinvention Collaborative Task Force, which was appointed by Erie County Executive Mark Poloncarz to review the Sheriff's Office. "Generally, police are rarely held accountable for their actions, and when they are, the disciplinary action is almost always too light."

## Records were off-limits

The New York State Public Officers ries of internal affairs cases that shed new light on how police agencies police their own.

The Buffalo Police Department had such an antiquated system of record-keeping that leaders originally said it would take months to provide files on its more than 800 officers. The department has since turned over basic disciplinary records on hundreds of officers who were suspended or fired.

But there is delay and hesitancy in other departments to turn over their disciplinary records.

The New York State Police said The News' record request – which asked for sustained allegations against all troopers in Western New York's Troop A – was too broad and could not be fulfilled because troopers often move between different troops or areas of the state.

For 17 months, the Niagara Falls Police Department failed to release a single disciplinary record in response to The News' Freedom of Information request. City officials in October 2020 said the request for police disciplinary records would be granted or denied within 20 business days, though they said response times would be affected by Covid-19.

More than 350 business days passed before the city – after follow-up inquiries by The News – produced a ledger of more than 200 misconduct cases dating back to 2015.

Through a spokesperson, Niagara Falls Mayor Robert Restaino said the city's Law Department was responsible for the delay. Police Chief John Faso said the Police Department did not oppose the release of the records.

Cheektowaga Police Chief Brian J. Gould said the new law, along with the proliferation of body-worn cameras, has ushered in a new era of transparency for law enforcement in New York.

"It's been a challenging thing for police officers to get used to that change, but I think it does absolutely help with public confidence in the profession," Gould said.

But Cheektowaga – after originally releasing hundreds of files to The News on many of its officers – has, after consulting with attorneys, begun to deny some FOIL requests on the grounds that the records contain "technical violations" that "do not involve interactions with members of the public" or "are not of public concern."

"At the same time, we have to answer to our employees," Gould said.



**Sheriff's Deputy Joseph Flagler was disciplined in 2017 for using a racial slur while off duty. He told The News he regrets the incident.**

named above, there are also records from police agencies in Amherst, Lancaster, the City of Tonawanda, West Seneca and the Niagara Frontier Transit Authority Police.

The database also includes records of some case decertifications involving New York State police, Lackawanna police and Lockport police that came from the state Division of Criminal Justice Services.

The database of allegations includes excessive use of force, false arrests, sleeping or drinking alcohol on duty, sick time abuse, domestic disputes, drunken driving, allowing prisoners to escape, falsifying records, insubordination and workplace harassment.

The News did not include in the database cases where the outcome was not clear, where the allegations were withdrawn or where the cases are still being reviewed by police agencies.

When supervisors determined there was misconduct by their officers, the most common punishments were verbal or written reprimands, which were given 52% of the time. Thirty-nine percent of cases resulted in suspensions, which ranged from one shift to 30 days.

Less than 10% of the time the officers were fired, resigned or retired while facing disciplinary measures.

Roughly 200 cases involved allegations of police officers using excessive force on civilians.

When police internal affairs units investigate the use of force, they either exonerated their fellow officers or said there was not enough evidence to prove wrongdoing 86% of the time. Police agencies found their officers used excessive force 28 times in a five-year period.

## Excessive force in Tonawanda

One excessive force case involved Adam Cruz, a City of Tonawanda police officer.

Cruz, a Tonawanda native who

the Taser with offic close proximity to th pervisor wrote.

But on June 1, 20 a vehicle after receiv Molotov cocktail bei a car's window on th way.

After the driver a exited the vehicle or second passenger – age of 18 – stepped c with her arms above

Police said the gi around when order "charged" at the wo his leg to perform a striking [redacted] in knocked her against her to fall to the gro injury."

One witness told was pretty sure the g out cold before she l then watched her ge sweatshirt hoodie ac

The woman later she "must have blacke struck her. A female if she needed medica said she had injuries legs, knees, heels, nec

"Officer Cruz's us occupant was unne was of no immediate the officers at the sce wrote, adding that he rapidly escalate" the

Cruz was suspen He signed an agre Tonawanda mayor though he "committe misconduct," the city Cruz "one last chance if he stayed out of tro

But less than si Tonawanda police n that they were rem cause "for incompete duct pursuant to ... a ignation or retiremen plinary process has c

The city and Cruz as defendants in a State Supreme Court the force. Video show tackled a vendor at C at the time said Cru up a fight, but the ma was unprovoked and ously injured.

Reached by phone to comment about h cord. Tonawanda Po ric Foels said the cit declined to comment than to say he left th October 2020.

NAthaniel myeRs #23321
11581 Walden Avenue • Alden, New York 14004

CERTIFIED MAIL

7014 0510 0000 3126 5601

USDC-WDNY
AUG 24 2023
ROCHESTER

To united States District Court ClerK"
2120 u.S. CouRthouse
) State StReet
ochester N.y. 14614-1387

Correction
US POSTAGE IMI PITNEY BOWES
ZIP 14202
02 7H
0006102069
$ 009.10⁰
AUG 22 2023